```
 1        IN THE UNITED STATES DISTRICT COURT
 2           WESTERN DISTRICT OF OKLAHOMA
 3   CLARK A. WARD              )
     individually, and
 4   CAW IMAGING, P.C.,         )
     an Oklahoma professional
 5   corporation,               )    CASE NO.
 6              Plaintiffs,     )  CIV-03-1564-F
 7   VS.                        )
 8   HEALTHSOUTH CORPORATION,   )  DEPOSITION OF:
     a Delaware Corporation;
 9   DIAGNOSTIC HEALTH          )  ROSA HOOPER
     CORPORATION, a Delaware
10   Corporation; RICHARD. M.   )
     SCRUSHY, an individual,
11                              )
                Defendants.
12                              )
13            S T I P U L A T I O N S
14       IT IS STIPULATED AND AGREED, by and
15   between the parties through their
16   respective counsel, that the deposition
17   of:
18            ROSA HANDLEY HOOPER,
19   may be taken before Carrie M. Robinson,
20   Commissioner and Notary Public, State at
21   Large, at the Law Offices of Balch &
22   Bingham, on the 5th day of April, 2005,
23   commencing at approximately 9:00 a.m.
```

EXHIBIT 3

ORIGINAL

```
 1  information that you have copies of there,
 2  we apparently -- my assumption was that
 3  we -- Mara gave that information to them to
 4  talk about HealthSouth.
 5  Q         Okay.  And by that information,
 6  I'm looking at what has been produced as W
 7  864 through W 882.  And just take a minute
 8  to look at that and see if that appears to
 9  be the type of documentation or marketing
10  materials that would have been provided to
11  potential sellers like MICO during the
12  initial stages of negotiations.
13  A         Yes.
14  Q         Okay.  And included in those
15  materials and page Bates stamped as 897,
16  there is information regarding financial
17  results and projections, correct?
18  A         Correct.
19  Q         All right.  And is it your
20  understanding that these financial results
21  and projections contained in these
22  materials include the fraudulent accounting
23  entries made by HealthSouth during this
```

1  time period?
2  A          My understanding is that they
3  would have.
4  Q          And these documents were given
5  to potential sellers like MICO and Dr. Ward
6  for them to rely upon in making a
7  determination of whether to sell and
8  affiliate themselves with HealthSouth,
9  true?
10 A          Can you repeat the question?
11 Q          You bet.  See if I can do it a
12 little better.  The marketing materials and
13 documents that we have been talking about
14 here were given to potential sellers like
15 MICO for them to rely upon in making a
16 determination whether they wanted to sell
17 to MICO -- I mean, to HealthSouth?
18            MR. STEWART:  I am going to have
19 to object to that question, too, because
20 the intent behind giving the documents I'm
21 not sure Rosa would be able to speak to.
22            MS. CASTLEBERRY:  She's who you
23 produced as the most knowledgeable.

1  Q        So if you know, what is the
2  purpose of providing a potential seller
3  with information regarding financial
4  results and projections?
5  A        My understanding is that it
6  would be just to give them -- all of that
7  information is general information about
8  HealthSouth.
9  Q        And HealthSouth wants these
10 potential sellers to rely on
11 representations that HealthSouth has a
12 strong financial net worth, true?
13           MR. STEWART:  Object to that.
14 It's the relying upon that I'm concerned
15 about here.  I don't think she can speak to
16 the intent.
17 Q        You can answer if you know.
18 A        Again, my understanding is that
19 we would give them this information to give
20 them general information about HealthSouth.
21 Q        And the general information that
22 you give them is favorable to HealthSouth,
23 is it not?

```
 1  A         I would say so.
 2  Q         You would hope so, wouldn't you?
 3  A         I wouldn't think we would give
 4  them anything otherwise.
 5  Q         Yeah.  You wouldn't want to go
 6  to them and say, you know, we are about to
 7  go bankrupt but we want you to affiliate
 8  with us?
 9  A         Correct.
10  Q         That wouldn't be a very good
11  marketing tool, would it?
12  A         No, it would not.
13  Q         On the flip side, if you go to
14  them and provide information such as is
15  contained in Ward 897, Bates Stamp W 897,
16  that is favorable financial information,
17  correct?
18  A         It is.
19  Q         Okay.  And we know that now to
20  have been false, true?
21  A         Correct.
22  Q         Let me have you take a look at
23  what has previously been produced in this
```

```
 1  case as W 918 and ask you if you have seen
 2  that document before.
 3  A          I did see this in my review.
 4  Q          Okay.  And, again, for the
 5  record, would you identify what that is?
 6  A          This is a March 21st, 1997,
 7  letter from Hal Truitt to Paula Fulton at
 8  MICO.
 9  Q          Okay.  And, generally, what in a
10  nutshell is the gist of that letter?
11  A          It is the type of letter that we
12  would have sent out following a cold call
13  where we found some interest from a
14  potential acquisition giving them general
15  information about HealthSouth, their
16  geographic coverage, their growth.
17  Q          And, again, the information
18  contained in that document is favorable
19  information about HealthSouth, is it not?
20  A          Yes, it is.
21  Q          And it contains information
22  regarding the financial wealth of
23  HealthSouth, true?
```

1    A         Correct.
2    Q         Contains information about the
3    optimistic projections concerning the
4    growth of HealthSouth, true?
5    A         Yes, it does.
6    Q         Okay.  And would you agree with
7    me that the document, the letter -- the
8    March '97 letter contains representations
9    concerning HealthSouth's net worth that we
10   now know to have been false?
11   A         Yes, it does.
12   Q         Okay.
13   A         May we take a break?
14   Q         You bet.
15             (Recess taken)
16   Q         (By Ms. Castleberry) Ms. Hooper,
17   let me hand you this binder again and have
18   you take a look at what has been marked as
19   W 922 through 940.
20   A         Okay.
21   Q         Take a minute to review that,
22   and my question is the same:  Does this
23   appear to be the type of marketing

1  information that would have been given to a
2  potential seller such as MICO during the
3  initial negotiation periods?
4  A        This is the type of information
5  that may have been given.  I do not know
6  specifically what was given.  I mean, this
7  is public information.  There's a press
8  release and there's an analyst report from
9  Merrill Lynch as the other things were.  So
10 I do not know specifically what was given,
11 but these may have been.
12 Q        Well, do you know what the
13 general practice was of the marketing
14 coordinators or marketing people when they
15 made calls to potential sellers like MICO?
16 A        Lecia Pate would be able to
17 better answer that question for you because
18 she was specifically involved in it.
19 Q        Okay.
20 A        This would not be unlike what we
21 may have provided, but I don't know
22 specifically what it was.
23 Q        Even if it were not specifically

```
 1  provided by a HealthSouth representative in
 2  person to Dr. Ward or other representatives
 3  of MICO, it was public information that
 4  HealthSouth put out for general
 5  consumption, true?
 6  A         The press releases were.  The
 7  analyst reports would come from, like,
 8  Merrill Lynch, for instance.  That would be
 9  available through Merrill Lynch.
10  Q         Correct.  But still available to
11  the public at large, correct?
12  A         Yes.
13  Q         And this information again
14  contains information very favorable to
15  HealthSouth and its financial picture,
16  correct?
17  A         Yes, it does.
18  Q         We now know that information to
19  be false, correct?
20  A         Correct.
21  Q         Now, after the initial contacts,
22  there were a number of proposals for the
23  asset purchase.  Is that your
```

1  accounting fraud.  Is that your
2  understanding?
3  A          That is my understanding.
4  Q          So then you don't know to what
5  extent Mr. Scrushy, Mr. Owens, Mr. Livesay,
6  Mr. Martin and others integrally involved
7  in the accounting fraud were controlling
8  the capital expenditures of HealthSouth, do
9  you?
10 A          I do not know.  You asked for my
11 opinion.
12 Q          Right.  But your opinion is
13 not -- you do not have the benefit of the
14 trial testimony and the guilty pleas to
15 form your opinion, right?
16 A          That's correct.
17 Q          Okay.  Would you agree that the
18 sworn testimony of the individuals who have
19 pled guilty to the fraud in describing the
20 mechanics of the fraud and the level of
21 control exercised by Scrushy would be a
22 better basis upon which for us to analyze
23 whether Mr. Scrushy had control or

```
 1  exercised control over the types of capital
 2  expenditures such as the purchase of new
 3  MRI at MICO?
 4  A         Better than my opinion?
 5  Q         Yes, ma'am.
 6  A         Certainly.
 7  Q         The HS 2036 page is a wire
 8  transfer request for the acquisition of
 9  MICO; is that correct?
10  A         That is correct.
11  Q         Those funds came from
12  HealthSouth, correct?
13  A         That's correct.
14  Q         Not DHC?
15  A         That is correct.
16  Q         Let me hand you what has been
17  produced in this case as W 468 and let you
18  take a look at that.
19  A         Okay.
20  Q         Have you seen that document
21  before?
22  A         I have, uh-huh.
23  Q         Would you identify that for the
```